**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL MCWILLIAMS, | : | Civil Action No.: 25-cv-1053 |
| Plaintiff, | : | |
| v. | : | |
| ERIK COSTA, JARED WHITE, & CITY OF MIDDLETOWN, | : | |
| Defendants | : | July 1, 2025 |

**COMPLAINT**

**Introduction**

1. This civil rights action under 42 U.S.C. § 1983 and Connecticut law challenges Defendants' unconstitutional denial of Plaintiff Michael McWilliams' pistol permit application and subsequent defamatory conduct. Plaintiff—a school teacher with no criminal record who has served as an adoptive parent—was deemed "unsuitable" for a permit based solely on unsubstantiated allegations that multiple prior investigations had conclusively determined to be false. Defendants not only denied Plaintiff's Second Amendment rights based on discriminatory stereotypes about gay men who care for children, but also affirmatively contacted Plaintiff's employer and falsely characterized him as having been investigated for "sexual assault and exploitation of juveniles," resulting in his suspension from employment. Through this deliberate publication of stigmatizing falsehoods coupled with tangible deprivations of liberty and property interests, Defendants violated Plaintiff's constitutional rights to equal protection, due process, freedom of association, and bearing arms, while also committing various torts under Connecticut law including defamation per se and invasion of privacy, causing substantial harm to Plaintiff's reputation, career, and emotional well-being. This action seeks accountability.

**Jurisdiction and Venue**

2. This is a civil action seeking relief for violations of the United States Constitution (via 42 U.S.C. § 1983) and Connecticut law. The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, including the First, Second, Fourth, and Fourteenth Amendments. The Court has supplemental jurisdiction over the Connecticut state-law claims under 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in Connecticut, specifically in the City of Middletown, and because all Defendants are located in Connecticut.

**Parties**

3. Plaintiff Michael Paul McWilliams is an adult resident of Pennsylvania (formerly of Connecticut) and at all relevant times was a secondary school teacher, a single homosexual male, and an adoptive parent. Plaintiff has no criminal record and has never been arrested or charged with any crime; he has an exemplary history as a teacher (never having his certification removed or investigated) and as an adoptive parent. Plaintiff previously lawfully owned firearms (including a handgun in 2022–2023 and a long gun around 2010–2015) without incident.

4. Defendant Erik M. Costa is the Chief of Police of the City of Middletown Police Department ("MPD"). He was, at all relevant times, the local authority responsible for acting on pistol permit applications in Middletown. He is sued in his individual capacity and official capacity as Chief of the MPD. At all relevant times, Chief Costa was acting under color of state law.

5. Defendant Jared White is a police officer or detective of the MPD who, on information and belief, handled or assisted with the investigation and background check of Plaintiff's pistol permit application. Defendant White made and published statements concerning Plaintiff in the course of that investigation. He is sued in his individual capacity. At all relevant times, Officer White was acting under color of state law.

6. Defendant City of Middletown is a municipal entity in Connecticut. The City, through its Police Department and Chief of Police, is responsible for enforcing laws and making suitability determinations for firearm permits. The City is a municipal employer of Defendants Costa and White and is liable for their actions as alleged herein to the extent provided by law (including Conn. Gen. Stat. § 7-465). The City also, through the official decisions of its final policymakers (such as Chief Costa), established the policies or customs that resulted in the violations of Plaintiff's rights described below.

**Factual Background**

**Plaintiff's Role as an Adoptive Parent; Unsubstantiated Allegations in Other Jurisdictions:**

7. Plaintiff is a single gay man who has been an adoptive parent and who in 2021 adopted a son through West Virginia's child welfare system. He also provided a home to other foster youth in need with the intent of adopting them. Unfortunately, Plaintiff's sexual orientation and status as a single male adoptive parent made him the target of false, malicious allegations rooted in harmful stereotypes that unfairly associate homosexual men with pedophilia. On multiple occasions between 2018 and 2024, allegations were raised against Plaintiff in different jurisdictions claiming he had engaged in inappropriate or abusive conduct toward minors under his care. None of these allegations were ever substantiated. In each

instance, child protection authorities and/or law enforcement investigated and found no evidence of wrongdoing by Plaintiff.

8. For example, in Marshfield, Wisconsin, Plaintiff provided housing to an 18-year-old youth (Tyler A. Joseph) who had been in need. Plaintiff did not even reside with Joseph during that time. However, after Plaintiff asked Joseph to leave the home due to behavioral issues involving female minors and Joseph's friend Hunter Mattheisen – reportedly the son of a retired police officer upset with Plaintiff – Mattheisen made accusations that Plaintiff had engaged in sexual misconduct with Joseph and was involved in the manufacturing and distribution of psilocybin mushrooms. Marshfield police thoroughly investigated these claims and concluded they were baseless.

9. In a letter dated November 1, 2022, the Marshfield Chief of Police confirmed that as of that date the department had "not established any probable cause" to arrest Plaintiff for any crime, nor any verified information to obtain a warrant; all accusations were merely speculative and did not meet any legal standard.

10. The Marshfield police records document that the case was "exceptionally cleared without arrest," i.e. closed with no charges filed. Indeed, Marshfield police noted that one accusing witness (Mattheisen) ultimately admitted that he, Mattheisen, had no evidence the Plaintiff *ever* engaged in anything sexual with Joseph. Additionally, Joseph, at the time, despite Mattheisen's allegations, denied any sexual relationship with the Plaintiff of any kind. Interestingly, and in a stark contradiction to his 2018 statements to the Marshfield Police, Joseph claimed, to Cortland Child Protective Services ("CPS"), in 2022 the Plaintiff gave him "testicular exams" and engaged in "kegel exercises" with him. These claims were eventually adjudicated in a defamation case the Plaintiff brought against Joseph. This resulted in a finding

of liability and an injunction against further defamatory statements. Notably, Mattheisen's interview with Cortland CPS demonstrated the discrimination the Plaintiff was subject to and how these allegations simply stemmed from the Plaintiff being a homosexual male. Mattheisen stated this in 2022.

11. In early 2022 in Cortland County, New York, Plaintiff was fostering two boys who had been placed with him through an adoption agency. The Plaintiff intended on adopting both boys as he did with his adopted son. On or about April 10, 2022, one of these foster children absconded from Plaintiff's home after Plaintiff confiscated the child's Plaintiff-provided cellphone as a disciplinary measure. The child was picked up by SUNY (State University) Police at a nearby college campus. In an emotional state, the child made angry, baseless threats against Plaintiff (saying he would "burn the house down" or "blow up" Plaintiff) and may have made claims of being "choked" and/or receiving "whoopings" at home.

12. The youth was taken to a local hospital for evaluation. There, hospital staff and responding officers found no evidence of abuse, and the child admitted he was just upset about losing his phone and that he had not been abused. The boy even expressed that he wanted to return to Plaintiff's home. He was released back into Plaintiff's custody that same evening. The very next day, Cortland County Child Protective Services (CPS) visited Plaintiff's home and initially "reported no issues" after observing the environment.

13. Shortly thereafter, however, CPS caseworker Kelley Thomsen of Cortland County began pursuing the matter aggressively, seemingly driven by bias. Thomsen questioned why a single man would even want to adopt children.

14. When Plaintiff's adoption agency and the boys' West Virginia caseworker inquired and challenged Cortland CPS's actions – noting the lack of evidence of any abuse –

Thomsen escalated his campaign against Plaintiff. Thomsen contacted the West Virginia State Adoption Program Director and falsely told her that Plaintiff was a "pedophile" and "sexual predator."

15. As a result of Thomsen's defamatory assertions (which the local WV caseworkers did *not* agree with), the two foster boys were removed from Plaintiff's home in April 2022 as a precaution. Curiously, however, the Plaintiff's adopted son was not removed during this event showing–despite Thomsen's allegations–there was no evidence to substantiate these allegations.

16. Immediately after removing the boys, Thomsen and a Cortland police detective subjected the children to independent forensic interviews. Both boys denied that Plaintiff had ever abused them – sexually or otherwise –with one of them claiming being with the Plaintiff was the "safest" he ever felt. Both boys disclosed no criminal conduct by Plaintiff. Notably, despite Thomsen's claims, Cortland CPS and police never arrested Plaintiff, never obtained any warrant, and did not remove Plaintiff's adopted son from his care.

17. Plaintiff, feeling targeted, relocated his family to Westchester County, New York after the boys were removed.

18. There, Thomsen made two more baseless child abuse calls to the statewide child abuse registry claiming the Plaintiff was sexually abusing his adopted son. Westchester County CPS reviewed the matter jointly with Cortland CPS. After interviewing Plaintiff's adopted son (who, like the foster boys, repeatedly denied any abuse) and reviewing the scant information from Cortland, Westchester authorities officially "unsubstantiated" all allegations against Plaintiff. Plaintiff is *not* listed as a perpetrator on New York's statewide child abuse registry. The Westchester CPS finding confirmed that Thomsen's accusations had no basis in fact.

19. In a last-ditch effort, Thomsen contacted the FBI with his accusations that Plaintiff was sexually abusing his son, trafficking children, and even committing adoption fraud. Federal authorities, after consideration, declined to pursue any case against Plaintiff, finding no substantiated wrongdoing.

20. By the end of 2023, all investigations across the various jurisdictions (Wisconsin, New York State, and FBI) were closed with no action taken against Plaintiff.

21. Plaintiff emerged with a completely clean record – no arrests, no charges, and no findings of abuse – because the allegations were uncorroborated and false. Plaintiff proceeded to file formal complaints and even legal actions against those he believed had defamed him in this ordeal (including lawsuits against Cortland County officials and the individuals who spread falsehoods).

22. The same cannot be said for Joseph who is now a convicted sex offender after sexually assaulting a young woman in Wisconsin and Mattheisen who has been charged with various infractions in different jurisdictions within Wisconsin.

**Plaintiff's Application for a Connecticut Pistol Permit and Denial by Middletown Police:**

23. In or about June 2024, Plaintiff applied to the City of Middletown for a permit to carry pistols and revolvers, as required under Connecticut law.

24. This local permit (sometimes called a temporary permit) is issued at the discretion of the police chief, who must determine if the applicant is a "suitable" person.

25. At the time of his application, Plaintiff disclosed his truthful personal history. He had no criminal convictions, no disqualifying mental health history, and no known incidents that would traditionally bar a permit.

26. However, during the background check, MPD became aware of the prior unfounded allegations from Wisconsin and New York.

27. Officer Jared White was assigned to investigate Plaintiff's background.

28. On information and belief, Officer White contacted out-of-state agencies and reviewed records related to those past investigations.

29. Critically, Officer White and MPD learned (or should have learned) that every one of those allegations had been investigated and dropped without any charges.

30. Indeed, the Cortland police report in MPD's possession explicitly noted that the two foster boys had denied any sexual or physical abuse by Plaintiff during their forensic interviews.

31. White was even informed by at least one source that Plaintiff had essentially been the *victim* of a biased CPS investigator (Thomsen) who was prejudiced against a homosexual single father.

32. Despite this knowledge, Defendants proceeded to treat the mere existence of prior accusations – no matter how discredited – as evidence of Plaintiff's supposed "unsuitability."

33. On or about September 6, 2024, Defendant Chief Costa issued a formal denial letter to Plaintiff, notifying him that his pistol permit application was denied.

34. This letter, written on MPD letterhead and signed by Chief Costa, contains several egregiously defamatory assertions about Plaintiff.

35. Specifically, the letter states, "[O]ver the course of several years you have been investigated by multiple different agencies, to include Marshfield Wisconsin Police, SUNY Police, Cortland Police, the FBI, and NY Child Protective Services, for crimes related to sexual assault and exploitation of juveniles."

36. It further says, "As recently as 2022 you had two foster children revoked from your home due to these allegations as well as evidence uncovered such as surveillance cameras in their bedrooms."

37. The letter goes on to claim, "You were accused by multiple foster children that resided in your house of choking or assaulting them and [of] perform[ing] sexual acts on them in addition to other potentially inappropriate conduct."

38. The letter concludes: "At this time we feel that you are not a suitable candidate to obtain a pistol permit."

39. These quoted statements in Chief Costa's letter are false and stigmatizing. They convey to any reader that Plaintiff is essentially a pedophile and child abuser who poses a danger to minors.

40. By issuing this letter, Defendants Costa (and White, who supplied the underlying content) effectively pronounced Plaintiff guilty of heinous acts – despite the fact that no agency ever found Plaintiff to have harmed a child and no charges were ever brought after years of investigation.

41. The letter's claims are not only factually untrue, they also omit the exculpatory context: that Plaintiff was *cleared* of all such allegations, and that critical evidence (like the foster boys' own statements) contradicted the accusations.

42. For instance, while the letter mentions surveillance cameras in the children's bedrooms (implying something nefarious), it fails to note the innocent explanation – that the cameras were a safety measure, commonly used in group homes for sexually reactive youth, and that the children never reported any abuse connected to those cameras.

43. The letter references foster children being "revoked" (removed) in 2022 due to allegations, but neglects to acknowledge that the removal was done by an overzealous caseworker and that the boys immediately told police Plaintiff had never abused them.

44. It cites "multiple foster children" accusing Plaintiff of sexual acts, when in reality no child ever substantiated any such claim. The one youth who made accusations (about a choking incident and received "whoopings") recanted claiming he was never physically abused.

45. In short, Defendants took a series of unproven allegations – products of bias and conjecture – and repackaged them as if they were established facts in order to justify denying Plaintiff a permit.

46. The true reason for Plaintiff's denial was not any legitimate public safety concern, but unlawful discrimination and animus. Defendants were influenced by invidious stereotypes about gay men, especially gay men who foster or adopt children. Faced with salacious accusations (however unfounded) that a homosexual man had "sexual involvement" with male youths, Defendants Costa and White jumped to the worst conclusions. They were quick to believe unsubstantiated age-old stereotypes about Plaintiff being a sexual predator/pedophile simply because he is a gay man who had cared for male children. They ignored the *actual* evidence of Plaintiff's innocence, focusing instead on the lurid narrative that aligned with their biases.

47. The pattern is clear: heterosexual applicants with actual arrest or conviction records were treated more favorably by MPD than Plaintiff, who had only unproven accusations against him. Indeed, MPD has issued permits to other Middletown residents who had been *arrested or even convicted* of crimes, yet Plaintiff – who was merely accused and never charged – was deemed "unsuitable". Such a disparity is inexplicable except as discrimination. There was

no rational or legitimate basis to treat Plaintiff as more dangerous than individuals with actual criminal histories; the only distinguishing factor was Plaintiff's sexual orientation and the nature of the false allegations (i.e. accusations involving male minors).

48. Moreover, Defendants Costa and White acted with reckless disregard for Plaintiff's rights and reputation. They knew or should have known that by labeling Plaintiff "unsuitable" on the basis of discredited accusations, they were effectively branding him a child molester without due process. Loss of one's reputation, coupled with the loss of a tangible interest such as employment or a license, triggers due process protections. Here, Defendants' actions had exactly that effect: they inflicted stigma and altered Plaintiff's legal status by denying him a benefit (a firearms permit) and by precipitating further harm to his employment (as described below).

49. Defendants provided no prior notice or opportunity for Plaintiff to clear his name before issuing the defamatory denial letter. Plaintiff only learned of these damaging claims upon receiving Chief Costa's letter around September 7, 2024. Plaintiff even tried to reach out to Chief Costa to discuss the contents of his letter, but was entirely ignored.

**Harm to Plaintiff's Employment and Reputation:**

50. The damage from Defendants' actions was not confined to Plaintiff's Second Amendment rights – it immediately spread to his professional life.

51. Upon or shortly after issuing the denial, MPD personnel affirmatively contacted Plaintiff's employer, a local school district, and shared the content of Costa's defamatory letter and related "background" information.

52. In essence, someone at MPD told Plaintiff's school officials that Plaintiff had been the subject of multiple investigations for sexual assault of minors and was considered "unsuitable."

53. This disclosure was made without Plaintiff's consent and with no legitimate necessity, as Plaintiff's pistol permit application and the underlying allegations were confidential matters not related to his job performance.

54. The effect was catastrophic: Plaintiff's employer, alarmed by the police's portrayal of Plaintiff as a suspected child predator, placed Plaintiff on administrative leave from his teaching position.

55. In a letter to Plaintiff, the school explicitly stated that this action was being taken in light of information received from the Middletown Police Department (i.e. the allegations relayed by Defendants).

56. Thus, as a direct result of Defendants' malicious communication, Plaintiff suffered a suspension from his employment and serious damage to his professional reputation in the school community. He was humiliated and effectively marked as a danger to children based on nothing but unproven accusations that had long been put to rest.

57. Defendants' outreach to Plaintiff's employer was wholly unwarranted and done in bad faith. Connecticut law and MPD's own policies do not authorize police to disseminate the details of a pistol permit background investigation to private third parties absent a court order or ongoing emergency. There was no ongoing criminal investigation in Connecticut involving Plaintiff, no pending charges, and no identified victim in Middletown – only the old, discredited accusations. By providing the employer with defamatory statements and information gathered

from a pistol permit confidential background check without a release, MPD violated Plaintiff's privacy rights and exceeded its authority.

58. The purpose and effect of contacting the school were not to protect anyone, but to punish and pressure Plaintiff.

59. On information and belief, Defendants intended to damage Plaintiff's livelihood and chill him from further pursuing his rights (such as appealing the permit denial or exposing the discrimination). Their actions had the foreseeable result of tarnishing Plaintiff's standing in the community and could have led to the end of his teaching career. Indeed, Plaintiff was effectively "blacklisted" – by being officially deemed a child abuser by local police, he faces severe hurdles to ever working with youth or even engaging in future fostering/adoption opportunities.

60. Plaintiff timely exercised his remedies to challenge these wrongs. He filed a statutory appeal of the permit denial to the Connecticut Board of Firearms Permit Examiners (which remains pending). Separately, Plaintiff filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO), alleging that the denial was based on unlawful discrimination (sexual orientation and sex) and that the MPD's act of alerting his employer constituted retaliation and a violation of confidentiality.

61. Releases of Jurisdiction of the CHRO matters were obtained on April 30, 2025.

62. In the meantime, Plaintiff complied with Connecticut's notice requirements for suing a municipality: he served a Notice of Claim on the City of Middletown (and its Clerk) within six months of the accrual of these claims, preserving his right to bring the state-law causes of action.

**Count I – 42 U.S.C. § 1983: Fourteenth Amendment Equal Protection**

**(Discriminatory Treatment)**

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff incorporates by reference all preceding paragraphs.

2. Defendants Costa and White, acting under color of state law, deprived Plaintiff of the equal protection of the laws, in violation of the Fourteenth Amendment, by intentionally subjecting him to differential treatment based on his sex and sexual orientation without any rational or lawful justification. The decision to deny Plaintiff's pistol permit – and the manner in which Defendants handled his case – was motivated by animus and stereotypes about homosexual men, particularly the pernicious stereotype conflating homosexuality with pedophilia.

3. Plaintiff was qualified for a pistol permit and had no disqualifying criminal or mental health record. Defendants nevertheless labeled him "unsuitable" solely because of unsubstantiated accusations concerning sexual conduct with male minors – accusations Defendants did not similarly weight against other applicants who are not gay men. As alleged, Middletown's own practices demonstrate the disparity: individuals *actually* arrested or convicted of crimes have been granted permits, whereas Plaintiff, who was merely the subject of accusations and never charged, was denied. This inconsistent treatment shows that Plaintiff was singled out due to bias, not any legitimate public safety concern.

4. Sexual orientation (and sex, including non-conformity with male gender-role expectations) are classifications for equal protection purposes. At a minimum, the actions taken against Plaintiff lacked even a rational basis. There is no rational relationship between Plaintiff's status as a gay adoptive father (with disproven allegations in his past) and any legitimate

government interest in public safety. On the contrary, all evidence showed Plaintiff to be law-abiding and no threat to anyone. The only "justification" for treating him as dangerous was prejudice or animus toward homosexuals*,* which does not pass constitutional muster. Indeed, the U.S. Supreme Court has struck down government action based on bare animus against gay people as violating equal protection, even under deferential rational-basis review. Here, Defendants' decision was fueled by impermissible animus and false, stereotype-driven assumptions – not by factual evidence or individualized risk.

5. Additionally, Defendants' disparate treatment of Plaintiff was intentional and purposeful. Chief Costa's letter and Officer White's statements explicitly reference the nature of the allegations (implying a moral condemnation of Plaintiff) and ignore the outcomes, reflecting a deliberate choice to treat Plaintiff as guilty because of who he is. The references to Plaintiff being a single male who "had foster children removed" and "was accused of sexual acts" reveal Defendants' reliance on the discredited trope that a gay man in Plaintiff's position must have preyed on children. No heterosexual applicant would likely have been denied under analogous circumstances (for example, mere unsubstantiated accusations with no charges).

6. By intentionally denying Plaintiff equal protection of the laws, Defendants Costa and White are liable under 42 U.S.C. § 1983.

7. The City of Middletown is also liable because the denial was the act of the Chief of Police – a final policymaker for the City in the context of firearm permitting – and thus represents an official policy or decision of the municipality. This policy/decision was to discriminate against Plaintiff on the basis of sex and sexual orientation.

8. As a direct and proximate result of Defendants' equal protection violations, Plaintiff has suffered and continues to suffer injuries including the denial of his permit (and thus

the inability to exercise his right to bear arms for self-defense), damage to his reputation, loss of employment opportunities, emotional distress, and other damages. Plaintiff also incurred costs (including legal fees) to challenge and mitigate Defendants' discriminatory actions.

**Count II – 42 U.S.C. § 1983: Fourteenth Amendment – Procedural Due Process (Stigma-Plus Deprivation)**

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff incorporates all preceding paragraphs.

2. The Fourteenth Amendment's Due Process Clause protects individuals from being deprived of liberty or property interests without adequate procedural safeguards. One liberty interest recognized by law is the interest in one's reputation coupled with the right to pursue one's occupation or other tangible interests.

3. Under the "stigma-plus" doctrine, a state actor cannot, without due process, inflict stigma on an individual (through false charges that seriously damage reputation) while also altering that individual's legal status or rights in a tangible way.

4. In this case, Defendants Costa and White, acting under color of state law, made and published defamatory statements about Plaintiff (the "stigma") in the course of denying him the pistol permit and communicating with his employer.

5. The content of Chief Costa's official letter – accusing Plaintiff of sexual assault/exploitation of minors and other egregious misconduct – is undeniably stigmatizing, as it exposes Plaintiff to public contempt, hatred, and ridicule.

6. These accusations impute criminal behavior of the vilest kind to Plaintiff.

7. Defendants publicized these stigmatizing charges beyond internal records: the denial letter was at least shared with the Board of Firearms Permit Examiners (as part of the appeal process) and, more egregiously, the MPD affirmatively conveyed the substance of these accusations to Plaintiff's employer, a third party.

8. This publication was not privileged or required by law; it was a voluntary disclosure by Defendants.

9. Alongside this stigma, Plaintiff suffered concrete, additional deprivations ("plus" factors) caused by Defendants' actions.

10. Firstly, Plaintiff was denied a firearm permit to which he was entitled but for Defendants' arbitrary and defamatory determination. While Connecticut's pistol permit is discretionary, Plaintiff had a legitimate expectation in fair consideration of his application; by wrongfully denying it based on false allegations, Defendants altered Plaintiff's legal status (rendering him ineligible to lawfully carry a handgun in Connecticut).

11. Secondly, and even more clearly, Plaintiff was suspended (placed on administrative leave) from his employment as a school teacher as a direct result of Defendants' stigmatizing statements to his employer. This adverse employment action – effectively a temporary termination or at least a material change in status – satisfies the "plus" requirement of a stigma-plus claim, as it is a deprivation of a liberty or property interest (the right to engage in one's profession) in addition to reputational harm. In short, Plaintiff's good name and his job were both taken from him in one fell swoop, without due process.

12. Defendants provided Plaintiff no pre-deprivation notice or opportunity to be heard to clear his name. The stigmatizing letter was issued without warning; Plaintiff had no chance to rebut the accusations before the decision was made. Nor was any prompt post-deprivation

hearing offered. By the time Plaintiff learned of the statements, the damage to his rights had occurred (his permit was denied and his employer already informed).

13. To this day, Plaintiff has not been offered any formal "name-clearing" hearing by the City or MPD to contest the false charges against him. The administrative appeal of the permit denial is not an adequate substitute, because that process evaluates suitability for a permit *de novo* and does not squarely address the damage to Plaintiff's reputation or the dissemination of false allegations to third parties (and the Board of Firearms Examiners has no authority to award damages or remedy the employment harm).

14. Defendants' failure to provide any procedural safeguard – not even the minimal step of verifying the truth of the allegations or giving Plaintiff a chance to tell his side – was fundamentally unfair and in violation of due process.

15. No emergency or exigency justified taking immediate action; Plaintiff was not charged with any crime, and the allegations were from the distant past and already investigated.

16. There was ample time to afford due process, yet Defendants chose not to. Their conduct was at least reckless, if not intentional, in disregarding Plaintiff's right to reputation and livelihood.

17. As a direct result of this denial of procedural due process, Plaintiff has suffered irreparable harm to his reputation, severe emotional distress, and significant professional and financial damages.

18. The stigma attached by Defendants continues to haunt Plaintiff, effectively barring him from employment in his chosen field (education) unless cleared. Plaintiff is entitled to relief under § 1983 for this violation of his Fourteenth Amendment rights.

**Count III – 42 U.S.C. § 1983: Fourteenth Amendment – Substantive Due Process**

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff incorporates all prior paragraphs.

2. Defendants Costa and White, under color of state law, also violated Plaintiff's substantive due process rights. The Fourteenth Amendment's substantive component protects individuals from arbitrary government action that "shocks the conscience" or interferes with rights implicit in the concept of ordered liberty. In this case, Defendants' conduct was so egregious and arbitrary that it rises to that level.

3. Defendants effectively convicted Plaintiff of being a child sex offender in the court of public opinion without evidence or trial. They resurrected long-closed accusations, ignored the actual outcomes (exoneration), and portrayed Plaintiff as guilty of heinous crimes simply to deny him a permit and tarnish his name.

4. Falsely branding someone a sexual predator and disseminating that falsehood, as an official act, is conscience-shocking. It demonstrates a gross abuse of authority that offends the community's sense of fair play and decency.

5. Defendants' actions also infringed on certain fundamental liberty interests. Family integrity and intimate association (such as the parent-child relationship) are interests protected by substantive due process.

6. By maligning Plaintiff as a danger to children, Defendants jeopardized Plaintiff's relationship with his own adopted son and effectively foreclosed his ability to serve as a foster or adoptive parent in the future.

7. Any state actor who arbitrarily labels a fit parent a child abuser, without cause, intrudes on the fundamental right to family life.

8. Furthermore, the right to follow a chosen profession free from unreasonable governmental stigma can be viewed as a protected liberty interest; here, Defendants' unfounded public accusations have gravely impaired Plaintiff's ability to continue in his profession as a teacher, a calling that involves trust and reputation.

9. The conduct of Defendants had no legitimate governmental purpose. There is no valid interest in misrepresenting facts or spreading unsubstantiated allegations. Even if preventing child abuse and ensuring public safety are legitimate aims, those aims were not actually furthered by Defendants' actions – because Plaintiff was *not* a child abuser, and all evidence showed he posed no safety risk.

10. Defendants' actions were "so egregious, so outrageous, that they may fairly be said to shock the contemporary conscience." Their use of the pistol permit process as a vehicle to punish Plaintiff for unfounded suspicions (or personal bias) was an arbitrary exercise of power.

11. Defendants Costa and White are liable under § 1983 for violating Plaintiff's substantive due process rights.

12. The City of Middletown is also liable to the extent that Chief Costa's decision represents official municipal policy in this area.

13. Plaintiff has suffered damages as described above.

**Count IV – 42 U.S.C. § 1983: First Amendment – Retaliation (Free Speech/Association)**

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff incorporates all preceding paragraphs.

2. The First Amendment protects the right to free speech, to petition the government for redress of grievances, and to freedom of association. Government officials may not retaliate against an individual for engaging in protected speech or associations.

3. After Plaintiff's pistol permit application was submitted (and during its pendency), Plaintiff began engaging in protected activity related to his case.

4. For example, he submitted a Freedom of Information Act request to the MPD on September 4, 2024, seeking data on permit approvals and denials – an act of petitioning the government for information and accountability.

5. Shortly after, Chief Costa issued the denial letter replete with defamatory detail. Plaintiff also filed a discrimination complaint with CHRO on September 20, 2024, and served notice of intent to sue the City (both protected petitions).

6. Upon learning of Plaintiff's challenges to their conduct, Defendants compounded their retaliation by actively reaching out to Plaintiff's employer to damage his employment.

7. The timing and manner of contacting the school – immediately after Plaintiff started fighting back – suggests a retaliatory motive to "send a message" and chill Plaintiff's opposition.

8. Additionally, Plaintiff's intimate association with his foster/adoptive children (a relationship protected by the First Amendment right of association and the Fourteenth Amendment) was effectively penalized by Defendants.

9. Defendants were hostile to his associations – i.e., a gay man fostering boys – and that this hostility fueled their actions. By punishing Plaintiff for those associations (via the permit denial and defamatory publication), Defendants infringed his right to form familial relationships free from unwarranted government interference.

10. Defendants' conduct would deter a person of ordinary firmness from exercising First Amendment rights. In Plaintiff's case, the retaliation was severe: loss of his good name, suspension from his job, and the prospect of being ostracized in his community. This chilling effect was not only probable; it was perhaps the very goal of Defendants' actions – to deter Plaintiff from further pursuing his appeals and to dissuade other marginalized individuals from speaking out.

11. There was no legitimate justification for Defendants to take the actions they did in response to Plaintiff's speech or associations. Any claimed reason (such as "protecting children" or "public safety") is plainly pretextual given the lack of evidence against Plaintiff and the irregular steps (like employer notification) that are not standard procedure.

12. Therefore, Defendants Costa and White (and the City via official policy) violated Plaintiff's First Amendment rights by retaliating against him for protected speech/petitioning and/or for his protected associations. Plaintiff has incurred significant damages as a result, including loss of employment, emotional distress, and the cost of having to continue to fight to clear his name.

**Count V – 42 U.S.C. § 1983: Second Amendment** (Right to Keep and Bear Arms)

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff incorporates all prior paragraphs.

2. The Second Amendment of the U.S. Constitution protects the right of law-abiding citizens to keep and bear arms for self-defense. This right, as recognized in *Heller* and *McDonald*, applies to the states and limits the ability of officials to deny firearms access to qualified individuals. Connecticut's pistol permit scheme, which includes a "suitability"

requirement, must be applied in a manner consistent with the Second Amendment (especially in light of *Bruen*, which requires licensing decisions to be grounded in this Nation's historical tradition of firearm regulation).

3. Defendants Costa and White, acting under color of law, violated Plaintiff's Second Amendment rights by denying him a permit to carry pistols without any valid cause, effectively barring him from exercising his right to bear arms.

4. Plaintiff is a law-abiding citizen: he meets all statutory criteria for a permit and is not in any prohibited category.

5. The sole basis for denial was Defendants' citation of decades-old unproven accusations – in other words, mere allegations, not convictions. Such a basis is not a constitutionally permissible ground to strip someone of core Second Amendment rights.

6. The denial was *"arbitrary and capricious"* and driven by bias, not by any *"historically recognized justification"* for disarming an individual (e.g. a felony conviction or dangerous mental illness).

7. By enforcing the firearm licensing laws in a discriminatory and retaliatory manner against Plaintiff, Defendants infringed his right to keep and bear arms.

8. The denial letter itself essentially concedes that Plaintiff had owned firearms previously "with no issues", and it identifies no new disqualifying conduct – only *accusations*.

9. In effect, Defendants have imposed a special disability on Plaintiff's Second Amendment rights due to his status and alleged associations, which is inconsistent with constitutional guarantees.

10. The City of Middletown is also responsible, as the denial was an official act by the Chief of Police. To the extent Connecticut law afforded the Chief discretion, that discretion was exercised in a way that violated the Constitution, making the City liable under *Monell*.

11. As a result of this unconstitutional denial, Plaintiff has been unable to lawfully carry a handgun for personal protection, a right which he values highly, especially given that he has faced harassment and threats in the past (including from the disgruntled individuals who made false allegations).

12. He has suffered not only the loss of the specific license but also the loss of his sense of security and the dignitary harm of being unjustly labeled unfit to exercise a fundamental right. Plaintiff seeks damages relief to redress this violation and restore his good name so that he may obtain a permit free of the taint of Defendants' unlawful actions (though Plaintiff is not, in this suit, asking the Court to directly issue the permit given the separate pending appeal).

**Count VII – Defamation (Libel and Slander, including Per Se)**

**Michael McWilliams v. All Defendants**

1. Plaintiff incorporates all preceding paragraphs.

2. Defendants Costa and White published false and defamatory statements about Plaintiff, both in writing (libel) and orally (slander), which have harmed Plaintiff's reputation. Chief Costa's September 6, 2024 denial letter constitutes libel per se: it was a written communication falsely accusing Plaintiff of serious crimes involving moral turpitude (sexual assault and exploitation of minors). Such accusations are defamatory *per se* under Connecticut law, meaning damages are presumed because the statements impute criminal offenses of the worst kind to Plaintiff.

3. The defamatory content of the letter includes, but is not limited to: (a) the assertion that Plaintiff was investigated by multiple agencies for crimes of sexual assault/exploitation of juveniles; (b) the assertion that in 2022 two foster children were removed from Plaintiff's home *due to allegations* of sexual abuse and "evidence" like bedroom cameras; and (c) the assertion that multiple foster children accused Plaintiff of choking or assaulting them and performing sexual acts on them.

4. These statements are false in every material respect.

5. Investigations did occur, but they concluded with findings of *no wrongdoing* by Plaintiff (facts which the letter omits).

6. No "evidence" of abuse was ever uncovered – the presence of security cameras was not evidence of a crime, and even the children involved did not allege those cameras were used for exploitation.

7. No foster child ever accused Plaintiff of sexual acts; the only individual who made such an allegation (Tyler Joseph) was an adult by the time of claim, was an adult at the time of the claim, was found to be not credible, and a court later entered a default judgment against him for defamation.

8. Likewise, while one foster child (Skyler B.) at first alleged Plaintiff had choked him, he promptly retracted that statement on video, admitting Plaintiff never harmed him. Skyler B. even stated that during said event the Plaintiff restrained him and said "stop I love you".

9. Chief Costa's letter fails to acknowledge these crucial facts and instead conveys a defamatory falsehood: that Plaintiff is essentially a child abuser who escaped formal charges.

10. Defendant White is liable as a defamation joint tortfeasor because he authored or supplied much of the false information that Costa published.

11. In the course of Plaintiff's background investigation, White prepared reports or statements (shared internally and possibly with the Firearms Board) that mirrored the defamatory claims.

12. For instance, White's written summary alleged that Plaintiff had tried to get young people to move with him to New York under false pretenses and engaged in other manipulative behavior – statements which were untrue and unsupported, as evidenced by contrary investigative reports.

13. White also told Plaintiff's employer (or provided the information that was told) that Plaintiff was under investigation for sexual misconduct.

14. Any verbal statements White or others made to the school officials repeating the letter's content are slander per se, as they likewise impute horrible crimes to Plaintiff.

15. These false statements were published to at least one third party without privilege. The denial letter, though addressed to Plaintiff, was effectively published to others: MPD kept a copy on file accessible to personnel and future decision-makers, and its contents were conveyed during the administrative appeal process.

16. More directly, the MPD's communication with Plaintiff's employer was a publication to third parties outside any law-enforcement privilege.

17. Defendants had no privilege to share investigatory allegations with the school, as it was not done in a judicial proceeding, nor was it a fair report of any official action (no charges existed). It was an unfiltered dissemination of derogatory claims.

18. Defendants made these statements with at least negligence as to their truth, and in fact Plaintiff will prove they acted with actual malice (knowledge of falsity or reckless disregard for the truth).

19. By September 2024, Defendants knew that all allegations against Plaintiff had been investigated and found baseless.

20. They possessed documentation (like the Marshfield Chief's letter and the Cortland police report) that directly refuted the notion that Plaintiff committed any crime.

21. Yet Defendants chose to state the allegations as if true, cherry-picking incriminating details and suppressing all exonerating information.

22. The inclusion of sensational specifics (cameras in bedrooms, multiple accusers, etc.) without context, and the failure to mention Plaintiff's clearance, show a reckless disregard for the truth – if not an intentional lie.

23. Defendant White's own police training would have taught him the importance of accuracy, and Chief Costa, as the signatory, had a duty to ensure the truth of what he signs. Their blatant departure from the truth permits an inference of malice.

24. As a direct and proximate result of the defamatory statements, Plaintiff has suffered severe harm, including but not limited to: injury to his personal and professional reputation, humiliation, embarrassment, emotional distress, loss of income (from being placed on leave and facing potential job loss), and other pecuniary losses.

25. Plaintiff's damages are ongoing, as the stigma continues to affect his employment prospects and personal relationships.

26. Because the statements were defamatory per se, Plaintiff does not need to prove special damages, but he notes that his suspension from work did cause real financial loss (lost salary during leave) and attorneys' fees to address the situation.

27. Punitive damages are warranted against the individual Defendants for their willful and malicious conduct in defaming Plaintiff.

28. The City of Middletown is vicariously liable for the defamatory acts of its employees (to the extent not willful misconduct) under Connecticut law and must indemnify the individual Defendants for any compensatory damages pursuant to Conn. Gen. Stat. § 7-465.

**Count VIII – Negligence and Negligent Infliction of Emotional Distress**

**Michael McWilliams v. All Defendants**

1. Plaintiff incorporates all prior paragraphs.

2. This Count is pled in the alternative to any intentional tort claims, to account for any findings of negligence.

3. Defendants Costa, White, and the City of Middletown (through its agents) owed Plaintiff a duty of reasonable care in the processing of his pistol permit application and the handling of sensitive personal information obtained during that process. It was foreseeable that mishandling such information or making a decision on incorrect grounds would cause harm to Plaintiff's rights and well-being.

4. Defendants breached their duty of care in multiple ways.

5. First, they conducted a grossly inadequate and careless background investigation. Even if it was proper to inquire into the past allegations, Defendants negligently failed to verify the outcomes of those allegations or give weight to official findings that cleared Plaintiff. A reasonably prudent police investigator in 2024, upon learning of multi-jurisdictional accusations, would have gathered the final reports or spoken with the agencies involved. Had Defendants done so diligently, they would have discovered (or did discover but negligently ignored) that Plaintiff was *"exceptionally cleared without arrest"* in Wisconsin, *"unsubstantiated"* in New York, and never charged anywhere. Instead, Defendants negligently assumed "where there's

smoke, there's fire," and failed to exercise the care required to distinguish uncorroborated rumor from fact. This led to a wrongful determination of unsuitability.

6. Second, Defendants were negligent in the drafting and issuance of the denial letter. They included defamatory and inflammatory language without factual basis, which was a departure from the standard of care for official communications. A reasonably careful official would have limited the letter to a generic statement of denial or at least vetted the language for accuracy. Chief Costa negligently allowed (or authored) a letter that was replete with false statements. That letter was then foreseeably shared or became accessible, amplifying the damage.

7. Third, Defendants breached a duty of confidentiality and care when they disseminated Plaintiff's background information to his employer. Police departments are custodians of sensitive data (including allegations, investigative records, etc.), and they must handle such data responsibly. Here, MPD (through unknown personnel, possibly including White or Costa) negligently released information that was unverified and highly damaging, without any authorization. This was a clear breach of privacy standards and the duty to avoid unnecessary harm. It was eminently foreseeable that telling a school "your teacher was investigated for child sex abuse" would harm Plaintiff's employment and emotional state.

8. As a result of these negligent acts and omissions, Plaintiff suffered actual damages including severe emotional distress. Plaintiff experienced shock, anxiety, depression, and public humiliation upon learning that his employer and others believed him to be an accused child molester.

9. The negligent infliction of emotional distress is apparent: Defendants, in the course of denying the permit and handling the aftermath, should have realized that their actions

involved an unreasonable risk of causing emotional distress to Plaintiff, and that distress (being falsely branded a pedophile and suspended from work) if it occurred, might result in illness or serious psychological harm. In fact, Plaintiff's distress was severe – he suffered sleeplessness, loss of appetite, reputational shame in his community, and fear for his career and personal relationships.

10. The City of Middletown is liable under Conn. Gen. Stat. § 52-557n and common law for the negligence of its employees performed within the scope of their duties. None of the acts described were discretionary policy decisions shielded by immunity; rather, they were operational actions (conducting a background check, writing a letter, communicating with an employer) that had to be done non-negligently. Even if some discretion was involved, the identifiable victim/imminent harm exception to municipal immunity applies, as Plaintiff was an identifiable person (as an applicant specifically under review) subject to imminent harm from a wrongful denial and defamatory publication.

11. Therefore, Plaintiff seeks compensatory damages for negligence and negligent infliction of emotional distress. This includes damages for emotional pain and suffering, economic losses from his job suspension, and other consequential damages.

12. If the individual Defendants are found to have acted willfully or with extreme recklessness, they may not be indemnified for punitive damages, but the City must indemnify them for compensatory damages per § 7-465 (since Plaintiff provided timely notice of claim).

**Count IX – Prima Facie Tort** (Intentional Infliction of Harm Without Excuse)

**Michael McWilliams v. All Defendants**

1. Plaintiff incorporates all prior paragraphs.

2. Under Connecticut law (to the extent recognized, or under the persuasive common-law doctrine from other jurisdictions), Plaintiff pleads prima facie tort as an alternative theory. Prima facie tort occurs when a defendant, without any justification or lawful excuse, intentionally inflicts harm on the plaintiff by an otherwise lawful act.

3. Here, Defendants undertook actions that were not per se unlawful (e.g., writing a letter, communicating information) but did so with the sole or predominant intent to injure Plaintiff.

4. Defendants' actions – publishing defamatory allegations in an official letter and alerting Plaintiff's employer – had no legitimate purpose and were not required by any duty. The only reason to include such scurrilous detail in the letter (instead of a simple "denied for suitability" notice) was to harm Plaintiff's reputation.

5. The only reason to call the school was to harm Plaintiff's employment. These acts were malicious and inflicted special damages on Plaintiff, including the loss of his income during administrative leave and the costs of legal proceedings to defend himself.

6. Defendants did not act in good faith or for the benefit of public safety (since, as established, Plaintiff posed no actual threat). Their motives were improper: whether it was personal bias, anger at Plaintiff's insistence on his rights, or a desire to appear tough on a stigmatized individual, none is a lawful excuse for the harm inflicted.

7. As a result of Defendants' prima facie tort, Plaintiff has suffered the full array of damages discussed: loss of employment income, damage to reputation, emotional distress, etc. Under this cause of action, Plaintiff seeks all compensatory damages flowing from Defendants' intentional and unjustified harm. Additionally, since Defendants acted willfully, Plaintiff seeks punitive damages under this count to punish and deter such conduct.

**Count X – Violation of Connecticut General Statutes § 46a-64** (Discrimination in Public Accommodations)

**Michael McWilliams v. All Defendants**

1. Plaintiff incorporates all prior paragraphs.

2. Defendant City of Middletown (and its Police Department, as an agent of the City) operates a "public accommodation" as defined by Connecticut law. Specifically, the City through MPD offers services to the general public, including the service of processing pistol permit applications, which is a facility, privilege, or advantage offered to people generally who meet certain qualifications.

3. Under Conn. Gen. Stat. § 46a-64(a), it is a discriminatory practice for any person or entity running a public accommodation to deny any person the full and equal enjoyment of the services or facilities on the basis of sex or sexual orientation, inter alia.

4. Defendants violated § 46a-64 by discriminating against Plaintiff in the provision of the pistol permit service.

5. Plaintiff was entitled to have his application considered on its merits, free of bias. Instead, he was effectively "denied service" (denied a fair and prompt permit approval) due to his protected characteristics.

6. The denial letter's reliance on discredited, stereotype-driven allegations shows that Plaintiff's sexual orientation (homosexual) and sex (male, defying traditional norms by adopting children) were factors in the adverse decision.

7. The MPD did not treat Plaintiff the same as it would a heterosexual applicant or a female applicant without such stereotypes. Indeed, had Plaintiff not been a gay man fostering boys, it is highly unlikely the same unsubstantiated allegations would have been held against him in this manner.

8. Further, Defendants interfered with Plaintiff's "full and equal enjoyment" of the benefit when they went beyond mere denial and actively sabotaged his employment. Public accommodations law not only forbids outright denial of service but also unfavorable terms and conditions due to bias.

9. Here, Plaintiff received far worse treatment than others: unusual investigatory steps, gratuitous defamation, and breach of confidentiality – all because of who he is.

10. Plaintiff filed a timely discrimination complaint with the CHRO and has received a release of jurisdiction. (Plaintiff notes that § 46a-100 and § 46a-101 allow a complainant to bring an action in court after filing with CHRO and obtaining a release, which Plaintiff is in the process of securing.)

11. As a result of the violation of § 46a-64, Plaintiff suffered the aforementioned damages (emotional distress, reputational harm, economic losses). Connecticut law provides for compensatory damages and equitable relief for such discrimination, as well as reasonable attorneys' fees. Plaintiff seeks all such relief.

**Count XI – Invasion of Privacy (Public Disclosure of Private Facts and False Light)**

1. Plaintiff incorporates all prior paragraphs.

2. Defendants invaded Plaintiff's privacy by unlawfully disclosing private and false information about him to third parties, casting him in a highly offensive false light. Connecticut recognizes the torts of *Public Disclosure of Private Facts* and *False Light*. Both are applicable here on the facts alleged.

3. Defendants, without any privilege, publicly disclosed confidential and private facts about Plaintiff that were not of legitimate public concern. Specifically, they disclosed the existence of past child abuse *investigations* involving Plaintiff (and the salacious allegations therein) to Plaintiff's employer and perhaps others. The status and details of unsubstantiated CPS and police investigations are private matters – by law, child protective records are confidential, and information about mere accusations (as opposed to convictions) is generally not open to the public.

4. Plaintiff had kept these matters as private as possible (indeed, they never became public charges). MPD had access to these facts solely by virtue of Plaintiff's permit application and the background check.

5. Defendants then disseminated these facts gratuitously. The information disclosed – that Plaintiff was accused of sexual acts with minors – is extremely intimate and stigmatizing.

6. A reasonable person would find it highly offensive for the police to broadcast mere allegations of this nature, especially when they are false.

7. There was no consent or waiver by Plaintiff for MPD to share this information with his employer.

8. The disclosure was wide enough (to school administrators and potentially others in the school system) that it can be considered "public" for tort purposes; at minimum it was to a

large enough audience to substantially certain result in it becoming known in Plaintiff's community (as evidenced by the effect on his employment).

9. There was no public interest served by revealing these private facts – Plaintiff was not a public figure or public official, and the allegations were not part of any public proceeding (no arrest or trial). Thus, Defendants are liable for public disclosure of private facts.

10. Defendants gave publicity to information or material about Plaintiff that placed him in a false light which would be highly offensive to a reasonable person.

11. The "false light" here is portraying Plaintiff as a likely pedophile and child abuser. By selectively disclosing that Plaintiff had been "investigated for sexual assault of juveniles" and had foster kids removed for cause, etc., without explaining the falsity of those allegations, Defendants created a misleading impression.

12. Anyone hearing this from the police would reasonably (but wrongly) believe that Plaintiff had actually done awful things, even though he had not.

13. This portrayal is not just offensive, it is devastating. Defendants knew or acted in reckless disregard as to the falsity of the impression they were conveying. They had the true facts (no substantiation, no charges) yet proceeded to shine a spotlight on the accusations alone.

14. The false light in which Plaintiff was placed – as an unsafe predator among children – is something that would outrage the community and did in fact cause people to treat Plaintiff as persona non grata.

15. Defendants Costa and White both participated in this invasion of privacy: Costa as the author of the letter which he knew could be and was disseminated, and White as the source of much of the private defamatory content and as a direct contact to the employer. The City is

vicariously liable for its employees' actions here under respondeat superior (these acts were done in the course of their employment, albeit improperly).

16. As a direct result of this invasion of privacy, Plaintiff suffered the injuries described. The publicity of these matters caused him extreme embarrassment, loss of standing in the community, and mental anguish. The Court should award damages for these injuries. Furthermore, because the actions were willful and malicious (especially in the false light context), punitive damages are appropriate to punish and deter such egregious breaches of privacy.

**Count XII – Violation of Conn. Gen. Stat. § 52-571k**

**(Discriminatory Denial of Equal Protection – Pistol-Permit Letter)**

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff realleges and incorporates all preceding paragraphs.

2. Defendant Erik M. Costa is a "police officer," as that term is defined in Conn. Gen. Stat. § 7-294a, and at all relevant times acted under color of law and within the scope of his official duties as Chief of the Middletown Police Department.

3. On September 6 - 7, 2024, Defendant Costa denied Plaintiff's local pistol-permit application and issued an official letter stating, inter alia, that: "…over the course of several years you have been investigated by multiple different agencies … for crimes related to sexual assault and exploitation of juveniles… You were accused by multiple foster children … of choking or assaulting them and performing sexual acts on them… At this time we feel that you are not a suitable candidate to obtain a pistol permit."

4. Costa's letter relied on allegations he knew—or, in reckless disregard of the truth, should have known—had been fully investigated and found unsubstantiated by every agency cited.

5. Costa nevertheless treated those discredited accusations as conclusive proof of "unsuitability," while MPD routinely approves permits for applicants who are not gay single men and who have far more serious criminal histories.

6. Costa's decision and publication were motivated, at least in part, by discriminatory animus and stereotypical bias toward Plaintiff's sexual orientation and gender—specifically, the historic stereotype that homosexual men who foster or adopt boys are sexual predators.

7. By issuing the defamatory denial letter and refusing to grant the permit on this biased basis, Costa deprived Plaintiff of the equal protection of the laws and of equal privileges and immunities guaranteed by Article First of the Connecticut Constitution, in violation of Conn. Gen. Stat. § 52-571k(b).

8. Costa's conduct was deliberate, wilful, and undertaken with reckless indifference to Plaintiff's rights; therefore, governmental immunity is unavailable and Plaintiff is entitled to recover costs and reasonable attorney's fees under § 52-571k(f).

9. As a direct and proximate result, Plaintiff suffered denial of his firearms-licensing privilege, loss of reputation, emotional distress, and other damages described above.

10. Pursuant to § 52-571k(e), the City of Middletown is obligated to indemnify Costa for any compensatory award rendered against him in this Count.

11.

**Count XII – Violation of Conn. Gen. Stat. § 52-571k**

(Discriminatory Deprivation of Equal Protection – Disclosure to Employer)

**Michael McWilliams v. Erik Costa & Jared White**

1. Plaintiff realleges and incorporates the paragraphs above.

2. Defendant Jared White (and/or John Doe MPD officers yet unknown) is a "police officer" within the meaning of Conn. Gen. Stat. § 7-294a and acted under color of law at all times relevant.

3. Soon after the denial letter issued—on or about September 2024—White intentionally contacted Plaintiff's school-district employer and relayed the same false allegations of child-sexual-abuse investigations contained in Costa's letter, causing the district to place Plaintiff on administrative leave.

4. There was no legitimate law-enforcement purpose for disseminating confidential pistol-permit-background information to a private employer; MPD's own policies prohibit such disclosures absent a criminal proceeding or court order.

5. White's disclosure was undertaken to punish, stigmatize, and injure Plaintiff because he is an openly gay, single adoptive father challenging the permit denial, and thus stemmed from discriminatory bias and animus.

6. By selectively disseminating false, stigmatizing accusations and precipitating Plaintiff's suspension—treatment not imposed on similarly situated, non-gay permit applicants—White deprived Plaintiff of equal protection and equal privileges in violation of Conn. Gen. Stat. § 52-571k(b).

7. White's conduct was wilful, malicious, and in reckless disregard of Plaintiff's constitutional and statutory rights; accordingly, Plaintiff is entitled to recover his costs and reasonable attorney's fees under § 52-571k(f).

8. As a direct and proximate result, Plaintiff suffered loss of income, reputational harm, severe emotional distress, and other damages.

9. Under § 52-571k(e), the City of Middletown must indemnify White for any compensatory damages awarded herein.

**Prayer for Relief**

WHEREFORE, the Plaintiff Michael Paul McWilliams respectfully requests that this Court enter judgment in his favor and grant the following relief:

A. A jury trial;

B. An award of monetary damages against the Defendants, jointly and severally, in an amount to fully compensate Plaintiff for his injuries, losses, and harm, including but not limited to: damage to reputation, emotional pain and suffering, mental anguish, lost wages and benefits during his suspension, and other out-of-pocket expenses. Given the severity of the reputational harm, Plaintiff seeks not less than $500,000 or such amount as is proven at trial.

C. An award of punitive damages against the individual Defendants (Costa and White) under federal law (for the § 1983 claims) and under state common law (for the intentional torts) to punish their willful, malicious conduct and to deter such conduct in the future. These Defendants acted with evil motive or with reckless or callous indifference to Plaintiff's rights, justifying an exemplary damages award in an amount to be determined by the jury.

D. A declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 stating that the statements published by Defendants about Plaintiff (in the September 6, 2024 letter and related communications) are false and defamatory, and that Defendants' actions as described (including the discriminatory denial of Plaintiff's permit and the unauthorized dissemination of Plaintiff's information) were improper and unconstitutional. Such a declaration will help restore Plaintiff's good name and make clear that the government's accusations were unfounded.

E. An award of Plaintiff's reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 (for the § 1983 claims) and any other applicable provision. Given that Plaintiff has had to incur expenses to vindicate his civil rights and reputation in court, he is entitled to recover those fees from Defendants if he prevails.

F. An award of interest on any monetary award, at the statutory rate, from the date of the injuries or the date of judgment as appropriate, to ensure full compensation.

G. Any Other Relief the Court Deems Just and Proper.

Respectfully submitted,

Michael Paul McWilliams, Plaintiff

/s/Alexander T. Taubes ct30100
470 James St., Ste 007, New Haven, CT 06513
alextt@gmail.com
(203) 909-0048